1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RICHARD GARCIA,

11                  Plaintiff,                    No. CIV S-10-0259 GGH

12        vs.

13
     MICHAEL ASTRUE,
14   Commissioner of
     Social Security,
15
                    Defendant.              ORDER
16   _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB")

19   and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

20   ("Act").  For the reasons that follow, plaintiff's Motion for Summary Judgment is GRANTED IN

21   PART, the Commissioner's Cross Motion for Summary Judgment is DENIED IN PART, and

22   this matter is remanded to the Commissioner for payment of SSI benefits, and judgment with

23   respect to payment of SSI benefits only is entered for the plaintiff pursuant to sentence four of 42

24   U.S.C. § 405(g).

25   \\\\

26   \\\\

                                              1

BACKGROUND

        Plaintiff, born November 21, 1964, applied on July 21, 2004 for disability benefits.  (Tr. at 14, 31, 57, 61, 247.)  Plaintiff alleged he was unable to work due to bipolar disorder, anxiety and depression.  (Tr. at 66.)[1]  In denying plaintiff's application for benefits on July 27, 2009, ALJ James Mitchell made the following findings:[2]

> 1.    The claimant met the insured status requirements of the Social Security Act through September 30, 2001.

---

[1] Elsewhere, it is reported: "You said you are unable to work because of inability to work around people, left thumb, back and shoulder pain."  (Tr. at 50).  However, his treating physician has noted his right thumb osteoarthritis and right shoulder as the source of pain and restricted movement.  (Tr. at 208-210).  The record indicates plaintiff did complain of left wrist pain on December 11, 2003, to the first treating physician in the record, Dr. Dmitry Leongardt.  (Tr. at 116).  Plaintiff first saw Dr. Leongardt (Dept. of Internal Medicine), on July 22, 2003, complaining of "generalized fatigue," "some anxiety," "feeling depressed occasionally" and "occasional shortness of breath."  (Tr. at 19, 119).

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

2. The claimant has not engaged in substantial gainful activity since August 5, 1997, the alleged onset date (CFR 404.1571 *et seq*., and 416.971 *et seq*).

3. Through the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c)).

4. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 5, 1997, the alleged onset date, through September 30, 2001, the date last insured (20 CFR 404.1520(c)).

5. With regard to the claimant's Supplemental Security Income application, the claimant has the following severe impairments: osteoarthritis of the right thumb; partial thickness rotator cuff tear of the right shoulder; depression and anxiety (20 CFR 416.920(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

7. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he is slightly limited in the ability to pay attention, concentrate, understand and remember. Vision and hearing are unlimited.  He is slightly limited in overhead, side and front reaching with the right dominant upper extremity, with slightly defined as 6 hours or less each shift.  He is slightly limited in fine and gross manipulation with the right dominant upper extremity.  He is slightly limited in the ability to perform simple, repetitive tasks.  He can have unlimited contact with the public, requiring occasional supervision, and while bearing a slight to moderate degree of pain.

8. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9. The claimant was born on November 21, 1964 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963).

10. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

3

11.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.      Considering the claimant's age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 419.969, and 41.969a).

13.      The claimant has not been under a disability, as defined in the Social Security Act, from August 5, 1997 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 16-18, 31-32.)

       In summary, the ALJ found that there were no medical signs or laboratory findings for the existence of a medically determinable impairment through the date plaintiff was last insured (2001) to be substantiated. As to plaintiff's SSI application, while the ALJ found osteoarthritis of right thumb, right shoulder partial thickness rotator cuff tear and depression and anxiety to be severe impairments, he did not find plaintiff's claims of low back pain, asthma and dizziness to be supported as medically determined impairments. Despite the impairments he did find, the ALJ determined that the record described only mild restriction in daily living activities, mild difficulties in social functioning being maintained, and moderate difficulties in plaintiff's ability to maintain concentration, persistence and pace. (Tr. at 17-18.) Plaintiff argues that his severe impairments, bipolar disorder, ADHD, partial thickness rotator cuff tear and osteoarthritis of his right thumb, limit his ability to function at any exertional level on the sustained basis necessary for continuous or full-time employment. Plaintiff's MSJ[3] (docket # 20), p. 4.

\\\\\

---

[3] Motion for Summary Judgment.

NO ENTITLEMENT TO DIB

The courts own review of the record confirms the ALJ's finding as to the question of Social Security Disability Insurance Benefits.  As noted, plaintiff was last insured through September 30, 2001.  (Tr. at 17, 80).  As the ALJ stated, "there is no medical evidence dated prior to July 22, 2003, nearly two years after his date last insured."  (Tr. at 17).  The file reflects that, as the ALJ observed, plaintiff initially sought psychiatric treatment on June 15, 2004, and although plaintiff reported that his shoulder and thumb impairments began prior to 2001, plaintiff has not provided adequate support for this claim.  (Tr. at 17, 194-195).  "The claimant has the burden of proving that he became disabled prior to the expiration of his disability insured status." Macri v. Chater, 93 F.3d 540, 543 (1996).   Plaintiff has failed to meet this burden and plaintiff's Motion for Summary judgment is DENIED with respect to Title II DIB payments.

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ failed to credit the treating opinion of Drs. Saleem and Hidalgo; the examining opinions of Drs. Thurstone[4] and Johnson; and the non-examining opinions of the state agency physicians without a legitimate basis for doing so; B. Whether the ALJ failed to properly credit the testimony of the VE in response to questions which accurately reflected plaintiff's functional limitations; C. Whether the ALJ failed to ask the VE whether his testimony was consistent with the Dictionary of Occupational Titles (DOT) and therefore was not justified in relying upon his testimony.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

---

[4] Although plaintiff has spelled the name as "Thurston" herein, this doctor's report (and the ALJ) refer to "Thurstone." (Tr. at 21, 124, 129).

1   Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

2   as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

3   625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

4   ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

5   resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

6   omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

7   than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

8   ANALYSIS

9       A.  Whether the ALJ failed, without a legitimate basis, to credit the treating opinion of
    Drs. Saleem and Hidalgo; the examining opinions of Drs. Thurstone and Johnson; and the non-
10  examining opinions of the state agency physicians

11        Plaintiff contends that the ALJ rejected the medical opinion in the record of every

12  physician – treating, examining, and non-examining – instead relying on his own "undocumented

13  medical 'expertise'" in combination with "his personal observations at the hearing."  MSJ,[5] p. 21.

14  Plaintiff points out that the ALJ "opined that 'his observations of the claimant at the hearing were

15  that he had no observable mental or physical difficulties."  Id., citing Tr. at 31.  Citing Perminter

16  v. Heckler, plaintiff argues that in the Ninth Circuit, an ALJ's reliance on personal observations

17  at a hearing has been condemned as "sit and squirm" jurisprudence.  765 F.2d 870, 872 (9th Cir.

18  1985).  The Ninth Circuit determined that benefits cannot be denied based on an ALJ's

19  observation when a claimant's "statements to the contrary...are supported by objective evidence."

20  Id., at 872, citing Coats v. Heckler, 733 F.2d 1338, 1341 (9th Cir.1984).

21        The weight given to medical opinions depends in part on whether they are

22  proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

23  \\\\

24  \\\\

25  _____

26      [5] Plaintiff's motion for summary judgment.  (The court's electronic pagination is
    referenced).

F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[6]  Ordinarily,

more weight is given to the opinion of a treating professional, who has a greater opportunity to

know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

Cir. 1996).

        To evaluate whether an ALJ properly rejected a medical opinion, in addition to

considering its source, the court considers whether (1) contradictory opinions are in the record;

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a

treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81

F.3d at 831.[7]  In contrast, a *contradicted* opinion of a treating or examining professional may be

rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

\\\\

\\\\

---

[6]  The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[7] Defendant Commissioner suggests that the "judicially created" Ninth Circuit standard requiring the ALJ to provide "clear and convincing" reasons to reject the uncontradicted opinion of a treating physician exceeds the requirements of Congress and the Commissioner at the behest of Congress and "would appear to be improper."  Defendant's Cross-MSJ (docket # 21), p. 4.  While the Commissioner raises a colorable contention, he must be aware that this court is bound by Ninth Circuit authority.  See, e.g., Hart v. Massanari, 266 F.3d 1155, 1175 (9th Cir. 2001) ("A district court bound by circuit authority ... has no choice but to follow it, even if convinced that such authority was wrongly decided.")

1   2001),[8] except that the ALJ in any event need not give it any weight if it is conclusory and

2   supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

3   (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

4   881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

5   insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

6                          Treating Opinions of Drs. Saleem and Hidalgo

7               Plaintiff notes the initial psychiatric report by Dr. Hala Saleem, one of plaintiff's

8   two treating psychiatrists,[9] dated June 15, 2004, wherein plaintiff reported anxiety, difficulty

9   concentrating and socializing, that he got into arguments.  (Tr. 194).  He reported that he was

10  taking Prozac and Klonopin.  (Id.)  Dr. Saleem's Axis I diagnoses was to rule out Bipolar

11  Disorder NOS and an Axis V GAF of 60.  (Tr. at 195).  As noted below, with respect to the GAF

12  of 45 at which plaintiff was assessed by the examining psychiatrist some eight months later, the

13  ALJ cited the later GAF as "contradicted" by the treating psychiatrist's GAF of 60 assessment.

14  (Tr. at 21).  A particular GAF score is only of limited assistance, however.

15

16              As a global reference intended to aid in treatment, 'a GAF score
                does not itself necessarily reveal a particular type of limitation and
                is not an assessment of a claimant's ability to work.'  Stokes v.
17              Astrue, No. 8:08-cv-1657-T23HTS, 2009 WL 2216785, at *7
                (M.D.Fla. July 23, 2009) (citations omitted).  Indeed, 'GAF scores
18              are of very limited usefulness due to their failure to translate into
                concrete functional limitations.'  Id.; see Revised Medical Criteria
19              for Evaluating Mental Disorders and Traumatic Brain Injury, 65
                Fed.Reg. 50746, 50764-65 (Aug. 21, 2000) ("The GAF scale ...
20              does not have a direct correlation to the severity requirements in
                our mental disorders listings.").

21

22  Hernandez v. Astrue, 2010 WL 234954 (D. Ariz. 2010).  A GAF score is merely a snapshot in

23  
_____

24      [8]  The factors include: (1) length of the treatment relationship; (2) frequency of
    examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
25  (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

26      [9]  Drs. Saleem and Hidalgo, according to plaintiff, worked together at Modern Therapies,
    jointly treating plaintiff.  MSJ, p. 5, note 1.  This assertion is not disputed by defendant.

1  time.  Mann v. Astrue, 2009 WL 2246350 (C.D. Cal. 2009).  "While a GAF score may be of

2  considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."

3  Howard v. Commissioner of Social Sec., 276 F.3d 235, 241 (6th Cir. 2002).  GAF scores do not

4  dispositively assess a plaintiff's ability to work.  However, multiple GAFs assessed over a

5  period of time, conducted by the same or different examiner, are more instructive than the

6  singular snapshot in obtaining a picture of the mental/emotional limitations.

7              The ALJ correctly stated the following with respect to the June 15, 2004, initial

8  psychiatric evaluation by Dr. Saleem:

> The claimant said he had a lot of anxiety in public, difficulty
> concentrating.  He reported that he was working the "graveyard
> shift" until May 2004 but was now out of work.  The claimant did
> not think Prozac was helping his symptoms, as he was having a
> hard time socializing.  By history, the claimant reported several
> family deaths, and he said he had been caught selling drugs and
> was in prison for three years (Exhibit 13 F, page 18).  He also was
> "caught for welfare fraud."  He was in county jail in 2001 for three
> months and was still on probation.  He denied ever seeing a
> therapist or psychiatrist.  He said he drank occasionally and
> stopped smoking marijuana three to four months earlier.  Past work
> included carpentry and painting.  He denied medical problems.  He
> was assessed with bipolar disorder, NOS and ADHD.  He was
> assigned a GAF of 60.

17  (Tr. at 19).

18              Plaintiff also points to the letter report of his other treating psychiatrist, Dr. Vilma

19  Hidalgo,[10] dated October 26, 2007, in which, in a letter directed "to whom it may concern," she

20  stated that plaintiff had been a patient in her office since June 15, 2004, had been diagnosed as

21  having "Bipolar Disorder, Not Otherwise Specified, and Attention Deficit Hyperactivity

22  Disorder" and had first come to the clinic "due to anxiety, anger, and difficulty concentrating."

23  (Tr. at 160).  She continued:

24  

---

25  [10] The document is signed by Dr. Vilma Hidalgo and has as its letterhead "Modern
Therapies for Mind and Soul, Inc," identifying Dr. Hidalgo and the clinic as providing "Adult,
26  Adolescent & Child Psychiatry."  Tr. at 160.

He has been on Prozac in the past prior to coming to our clinic.

He is currently on medications including Lamictal 150 mg, two tablets a day, Prozac 30 mg, one tablet a day, Abilify 15 mg, one tablet at bedtime, Klonopin, 1mg, one tablet twice a day, and Adderall XR 30 mg, one tablet a day.

His current mental status showed good grooming and hygiene, cooperative and normal speech.  He denied any hallucinations or delusions.  He denies any suicidal ideations or homicidal ideations, Insight and judgment were poor under stress.  He still has a hard time concentrating and interacting with people.

His prognosis is guarded, but can be improved with therapy and compliance to treatment.

(Tr. at 160).

Regarding this letter report, the ALJ asserted: "I note that a review of the longitudinal treatment history indicates that the claimant's condition is relatively stable, with only occasional minor exacerbations."  While the defendant maintains that the ALJ's assessment of "relatively stable" was in reference to longitudinal treatment notes indicating "plaintiff was doing better, doing well or very well, or doing okay," plaintiff makes the point that "'stable'" in medical terminology means simply "'resistant to change.'"  Defendant's Cross-MSJ (docket # 21), p. 5, footnote 2; MSJ (docket # 20), p. 16).

In a "complete medical report (mental)," dated June 20, 2008, as plaintiff observes, Dr. Hidalgo noted that plaintiff had been treated at the clinic for the first time on June 15, 2004, and last treated on June 20, 2008.  (Tr. at 173).  Her clinical findings regarding plaintiff were "depressed, inability to concentrate or focus, anxiety."  Id.  Plaintiff was diagnosed as having Bipolar Disorder NOS and ADHD.  Id.  The medication she prescribed was Lamictal, Prozac, Abilify, Klonopin, and Adderall.  Id.  Plaintiff's response to treatment was assessed as "fair," and the prognosis was "guarded; may be better as long as patient stays with treatment."  Id.

\\\\

\\\\

The ALJ accurately summarizes (below) that Dr. Hidalgo assessed plaintiff's ability to make occupational, performance and personal/social adjustments as "poor,"[11] with the only exception being that his ability at maintaining his personal appearance was rated "good," by checking boxes, and she did not fill in any portions of the form which asked for a description of any limitations, including the medical/clinical findings to support the assessment.  (Tr. at 174-175).

The ALJ stated:

> On June 20, 2008 the claimant told Dr. Hidalgo that he had been depressed lately, but denied suicidal ideation (Exhibit 13F, page 3). Dr. Hidalgo noted: "He has difficulty organizing and finishing his work and goes from one thing to another.  He always has an excuse to get out of a job he is doing."  He said that he had a good weekend, and had gone camping with his family.  Prozac was increased.

> Also on June 20, 2008 Dr. Hidalgo completed a medical source statement in which he indicated that the claimant had been diagnosed with bipolar disorder NOS and ADHD (Exhibit 12F). Prognosis was guarded, but he noted "may be better as long as patient stays with treatment."  He then indicated by checking boxes that the claimant has a poor ability to follow work rules, relates [sic] to co-workers, the public, and supervisors; use judgment, deal with work stress, function independently, maintain attention/concentration, understand, remember and carry out detailed, complex or simple job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  The only ability that the claimant had that was listed as good was his ability to maintain personal appearance.  When asked to describe any limitations and include the findings to support the assessment, Dr. Hidalgo simply left the portion blank.

> I give reduced weight to this opinion.  While I recognize that Dr. Hidalgo is a treating physician, he does not provide an explanation for his conclusion, instead simply checking boxes.  Furthermore, these findings are contradicted by the treatment record which indicates that his condition is relatively stable, as fully discussed, in detail, below.  I also note that the claimant's activities of daily living, again discussed below, are not consistent with Dr. Hidalgo's "check the box" form.

---

[11] "Poor" was defined as "Ability to function in this area is seriously limited but not precluded."  (Tr. at 174).

1  (Tr. at 26).

2        With respect to the asserted contradiction between Dr. Hidalgo's psychiatric

3  opinion and the medical record or longitudinal treatment history, the ALJ made specific reference

4  to the treatment notes (of Dr. Hidalgo and, occasionally, Dr. Saleem[12]) for August 15, 2005;

5  October 14, 2005; November 9, 2005; January 17, 2006; February 4, 2006; May 20, 2006; July

6  29, 2006; September 22, 2006; October, 20, 2006[13]; December 15, 2006; March 30, 2007; April

7  27, 2007; June 12, 2007; July 13, 2007; September 11, 2007; October 11, 2007; October 26,

8  2007 [Hidalgo letter]; November 14, 2007; December 12, 2007; January 28, 2008[14]; February 29,

9  2008; March 28, 2008; May 22, 2008; June 20, 2008, July 22, 2008; September 29, 2008;

10  October 27, 2008; November 24, 2008.  (Tr. at 22-26, 177- 187, 189-191, 193).  The ALJ

11  asserted pointedly that with respect to October 14, 2005, November 9, 2005, January 17, 2006,

12  September 22, 2006, September 11, 2007, March 28, 2008, October 27, 2008 "[h]is psychiatrist

13  noted that he was doing 'okay.'"  (Tr. at 29).  On July 29, 2006 and September 29, 2008, "he was

14  doing 'very well.'"  (Id.)  The ALJ stated that on February 7, 2007, plaintiff was "alert"; on April

15  27, 2007, "doing a lot better"; on July 13, 2007, "doing well."  (Id.)  The ALJ stated that

16  plaintiff's medication was adjusted occasionally "with good results."  (Tr. at 29).  The ALJ

17  immediately followed this summary with this observation:

18        The claimant, however, has alleged an inability to perform all work
      due to his alleged impairment and other symptoms.  The claimant's

19        statements alone do not establish that he is disabled.  Such
      statements must be considered, first, in light of the objection

20        medical findings which, in this case, are limited.  Such statements
      must also be considered in light of other evidence such as the

21

22     [12] This court's review of the physician progress notes indicates that the ALJ often
attributed notes signed by Dr. Saleem to Dr. Hidalgo.  See, e.g., his reference to what plaintiff (as

23  claimant) told Dr. Hidalgo on March 30, 2007, April 27, 2007, July 13, 2007, where the notes are
evidently those of Dr. Saleem.  (Tr. at 23, 183-185.)  As the two psychiatrists evidently worked

24  in tandem with plaintiff, this disparity does not appear to be of significance.

25     [13] Apparently, inadvertently mis-dated as October 20, 2004.  (Tr. at 23).

26     [14] The date of this visit actually appears to be January 25, 2008.  (Tr. at 181).

1
claimant's daily activities, the location, duration, frequency and
intensity of the claimant's pain, precipitating and aggravating
2
factors, use of medications, treatment other than medications, other
measures used to relieve pain and other factors concerning his
3
functional limitations and restrictions due to his symptoms.  See,
20 CFR 416.929 and Social Security Ruling 96-7p.  I do not find
4
the claimant's statements regarding his pain and other symptoms
convincing or credible.

5

6  (Tr. 29).

7        What makes this assessment somewhat ironic is that, while the ALJ flatly rejects

8  plaintiff's credibility, he is citing snatches of plaintiff's own statements to his psychiatrists as

9  support for his own essential repudiation of the professional medical evaluation of plaintiff's

10  psychiatric condition.  In addition, plaintiff's psychiatrist(s) noted, on March 30, 2007, "he is not

11  doing very well" and getting into arguments with his daughter; that, on January 25, 2008, while

12  he was "less manicky" without Adderall, he slept more and lost focus, and "he is more depressed

13  lately"; that, on February 29, 2008, he continued to be depressed; that while he said he was doing

14  okay on March 28, 2008, that he had gotten into a fight with his daughter; that he said he was

15  depressed on May 22, 2008, unable to concentrate and had gotten into another argument with his

16  daughter; that he said, on June 20, 2008, he was depressed over the anniversary of a child's

17  death, and although he reported having a good weekend camping with his family, he had

18  difficulty organizing and finishing a task; that while he reported he was doing okay on November

19  24, 2008, he also said he was facing jail time for getting into a fight with a neighbor.[15]  (Tr. at

20  177, 179-181, 185.)  As noted the ALJ faults plaintiff's psychiatrist for checking off boxes.

21  However, this boilerplate form is not the sole submission by this doctor.  See Murray v. Heckler,

22  722 F.2d 499, 501 (9th Cir.1983) (expressing preference for individualized medical opinions

23  over check-off reports).  Rather, the record contains a four-year history of fairly regular monthly

24  visits plaintiff had with his psychiatrists as well as the on-going medications prescribed to treat

25
26        [15] Plaintiff testified that "[h]e was arrested in June 2008 for battery, after he chased
people with a dog chain."  (Tr. at 27, 274).

13

his condition(s).

An ALJ may properly rely upon only selected portions of a medical opinion while rejecting other parts.  See, e.g., <u>Magallanes v. Bowen</u>, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's supported reliance on selected portions of conflicting opinion constitutes substantial evidence). However, such selective reliance must be consistent with the medical record as a whole.  See, e.g., <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ cannot reject portion of medical report that is clearly reliable).

"An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008), citing <u>Morgan v. Comm'r Soc. Sec. Admin.</u>, 169 F.3d 595, 602 (9th Cir. 1999) (citing <u>Fair v. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989)). Furthermore, "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." <u>Id.</u>

The ALJ may rely, in part, on his or her own observations, <u>see</u> <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. <u>Marcia v. Sullivan</u>, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  The ALJ may not substitute her own layperson opinion for that of trained medical physicians.  <u>See</u> <u>Gonzalez Perez v. Secretary of Health and Human Services</u>, 812 F.2d 747, 749 (1st Cir.1987); <u>McBrayer v. Secretary of Health and Human Services</u>, 712 F.2d 795, 799 (2nd Cir.1983); <u>Gober v. Mathews</u>, 574 F.2d 772, 777 (3rd Cir.1978); <u>Ferguson v. Schweiker</u>, 765 F.2d 31, 37 (3rd Cir. 1985) (ALJ may not "set his own expertise against that of a physician who presents competent evidence").  It is not sufficient to state that the medical opinions are unsupported by sufficient objective findings or that they are contrary to preponderant conclusions.  <u>Embrey v. Bowen</u>, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ "must not succumb to the temptation to play doctor and make her own independent medical findings." <u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996).  The ALJ's RFC finding must be supported by medical evidence.  <u>Banks v. Barnhart</u>, 434 F.Supp.2d 800, 805 (C.D. Cal.

1  2006).  "Without a personal medical evaluation it is almost impossible to assess the residual

2  functional capacity of any individual."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

3        Historically, the courts have recognized conflicting medical evidence, the absence

4  of regular medical treatment during the alleged period of disability, and the lack of medical

5  support for a doctor's report based substantially on a claimant's subjective complaints as

6  specific, legitimate reasons for disregarding the treating physician's opinion.  Flaten, 44 F.3d at

7  1463-64; Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  The ALJ is not required to accept

8  the opinion of a treating or examining physician if that opinion is brief, conclusory and

9  inadequately supported by clinical findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.

10  2002).  Morehead v. Astrue, 2008 WL 3891464, *5 (E.D. Wash. 2008).

11        However, with respect to plaintiff's four-year history of psychiatric treatment by

12  Drs. Saleem and Hidalgo, which no medical opinion contradicts, the ALJ has improperly

13  substituted his own assessment of plaintiff's psychiatric limitations for those of medical

14  professionals.  While the ALJ has been clear and specific in painstakingly detailing the notes

15  taken by the psychiatrists in plaintiff's monthly visits over a span of years, his conclusion is

16  ultimately neither convincing nor legitimate.  Defendant is correct that plaintiff does not take

17  issue with the ALJ's credibility findings.  It is particularly ironic, therefore, as noted, that he so

18  heavily relies on the Drs. Saleem and Hidalgo's notes of plaintiff's own assessment of how he

19  was doing.

20        The fact of the matter is that psychiatry is based to a large degree on the opinions

21  of trained physicians who are skilled in ferreting out mental illness from a myriad of subjective

22  evidence.  We depend on these examiners to relate when, in their opinion, someone is not ill or

23  otherwise a manipulator, as opposed to a sick individual.  While it may seem at times, and

24  especially to this ALJ, that the "depression" or "bi-polar" condition found by psychiatrists is

25  more an attribute of the universal human condition, and not an individual illness, permitting the

26  overwhelming majority of humans to qualify as "disabled," the system has to rely on these

1   trained physicians to make the individual illness distinction.  The system may ultimately fail

2   through over-award of psychic distress lifetime disability benefits, but that is a matter for

3   Congress and the Executive.

4                         Examining Opinions of Drs. Thurstone and Johnson

5                         Dr. Phyllis Thurstone conducted a comprehensive psychiatric evaluation of

6   plaintiff on February 10, 2005.  (Tr. at 124-129).  Her DSM-IV Diagnosis:

7                         Axis I: Probable bipolar disorder, Type I vs. paranoid
                          schizophrenia
8                         Possible ADHD.
                          History of alcohol abuse in remission.
9                         Axis II: Mixed personality disorder.
                          Axis III: Deferred.
10                        Axis IV: History of unemployment.
                                  No income.
11                                History of legal charges against him.
                                  History of no work experience.
12                                History of mental illness.
                          Axis V: GAF 45.

13

14  (Tr. at 128).

15                        Dr. Thurstone made the following "Functional Assessment/Medical Source

16  Statement:"

17                        The claimant because of his history of legal problems and drug
                          abuse probably should have a payee if he is the beneficiary of any
18                        funds.  He is currently being supported by his girlfriend who is the
                          mother of his children.

19
                          The claimant could do simple and repetitive tasks in his
20                        examination and in his history, but he could not do more complex
                          and detailed tasks.

21
                          His greatest problem is that of getting along with others.  He
22                        socially isolates because of paranoia, ideas of reference, and
                          irritability.  He would have difficulty getting along with coworkers,
23                        supervisors, and the public.

24                        This claimant, because of his irritation, is expected to have
                          difficulty in the usual competitive work world working an eight-
25                        hour day with his psychiatric condition and unusual stress.

26  (Tr. at 128).

                                           16

1   The ALJ summarized Dr. Thurstone's evaluation as follows:

2   At the request of the State agency, the claimant was evaluated by
    psychiatrist Dr. Thurstone on February 10, 2005 (Exhibit 3F).  The
3   claimant said that his main problems were anxiety, depression,
    stress, hyperactivity, fear of death and "hurting self."  He then said
4   that mainly his problem was that he was unemployed since 1995,
    when he walked off the job because he could not get along with
5   people, was paranoid, fighting, and felt people were mocking him,
    staring and laughing at him.  In terms of activities of daily living,
6   the claimant said that he cooked, cared for his dogs, and went
    grocery shopping with his children and girlfriend.  He had energy
7   to work on cars and motors, which he said he enjoys doing (Exhibit
    3F, page 4).  He denied sweeping, mopping or vacuuming.  He
8   denied any social functioning.  While he used to go camping and
    on rides in the park, he said he "pretty much stays home, watches
9   television, and does things regarding the children."

10  Dr. Thurstone noted that the claimant was an extremely poor
    historian and seemed lost in thought.  He reported auditory and
11  visual hallucinations (Exhibit 3F, page 4), and said he was
    forgetful and cannot concentrate well.  The diagnosis was probable
12  bipolar disorder versus paranoid schizophrenia; possible ADHD;
    history of alcohol abuse in remission.  He was assigned a GAF of
13  45.  It was felt that he can perform simple and repetitive tasks but
    not detailed and complex ones.  He would have difficulty getting
14  along with coworkers, supervisors and the public based on his
    problem getting along with others, and because he "socially
15  isolates because of paranoia, ideas of reference, and irritability."
    He would have difficulty in the usual competitive work world
16  working an 8 hour day with his "psychiatric condition and unusual
    stress."

17

18  (Tr. at 21).

19  The ALJ then stated:

20  I give minimal weight to this opinion, as it is based on the
    subjective report of the claimant, who lacks credibility and the
21  statements and findings are contradicted by the treatment evidence.
    As discussed herein, the treatment notes consistently indicate that
22  the claimant denied auditory and visual hallucinations, directly
    contradicting his statements to Dr. Thurstone.  The GAF of 45 is
23  contradicted by the opinion of the claimant's treating psychiatrist,
    made just six months earlier, which attributed a GAF of 60
24  (Exhibit 13F, page 18).

25  (Tr. at 21).

26  \\\\\

On January 29, 2005, Dr. Ian Johnson conducted a comprehensive internal medicine evaluation of plaintiff, noting his medications at the time to be Lamictal, Prozac, Clonazepam and Lithium.  (Tr. at 121-123).  Dr. Johnson made the following diagnoses:

> 1.  Agoraphobia.
> 2.  History of depression.
> 3.  History of anxiety.
> 4.  Intense anger.

(Tr. at 123).

His "functional assessment" was as follows:

> Although I find Richard to be physically fit for manual labor, I nonetheless believe that his mental illnesses render him incapable of seeking, securing, and maintaining employment.
> Further work up and prognosis would therefore be best performed by a psychiatrist.

(Id.)

The ALJ's factual summary of the evaluation report is accurate:

> At the request of the State agency, the claimant was evaluated by Dr. Johnson on January 29, 2005 (Exhibit 2F).  His chief complaint was that he does not like to be around people.  He said he was unable to use public transportation as it made him "breathe heavily."  By history, he said he had a fear of public places ever since he got in an argument with his boss in 1992.  He said after the argument he quit his job at the Kodak plant in Manteca and was unsuccessful in attempting to get his job back.  He said he had been under the care of a psychiatrist since June 2004.  He lost his driver's license in 1994 and had not attempted to get it back. Medications consisted of Lamictal, Prozac, Clonazepam and Lithium.
>
> Upon physical examination Dr. Johnson noted that the claimant was very edgy and tense, and the doctor stated he feared for his safety.  The claimant refused to do range of motion unless the doctor assumed responsibility in case he was injured.  The claimant had no muscle atrophy, and motor strength was 5/5 in both upper and lower extremities.  Sensory examination was intact to light touch.  Dr. Johnson found no physical limitations, but that further work up by a psychiatrist was necessary.  He believed that the claimant's mental illness rendered him incapable of seeking, securing, and maintaining employment.

(Tr. at 20).

The ALJ then stated:

> I give reduced weight to this opinion.  First, I completely reject Dr. Johnson's conclusion regarding the claimant's inability to maintain work due to mental illness.  Dr. Johnson was conducting a physical examination of the claimant, not a psychiatric evaluation.  While he is a medical doctor, there is nothing to indicate how this conclusion was reached, other than the fact that he was afraid of the claimant and the claimant was not cooperative.  Subsequent treatment notes indicate that his mental condition is stable, as discussed below.  With regard to finding no physical impairment, I note that subsequent medical evidence does establish that the claimant has objective findings with regard to his thumb and shoulder.

(Id. at 20-21).

The court finds that the ALJ's essentially blanket rejection of the evaluation of plaintiff's psychiatric condition by virtually every physician with whom he came in contact was error.  The undersigned understands that the ALJ had reason to doubt plaintiff's credibility in light of plaintiff's inconsistencies with regard to his work history, his lack of full compliance with his physician's recommendations, his apparent continued use of alcohol and, at least occasionally, of marijuana, despite the admonitions of his doctors, and his general background, including his arrest record.  Moreover, the plaintiff's relative youth mitigates against him with respect to his entitlement to SSI benefits.  However, the ALJ simply does not have the authority, based on his own non-medical experience, to undermine the evaluation of a treating psychiatrist (or treating psychiatrists) who evaluated plaintiff over a four-year history of providing him with psychiatric treatment and medication.  Nor is it appropriate to undercut the assessment of the examining psychiatrist on the basis of the ALJ's evaluation of plaintiff's credibility, including his having told Dr. Thurstone that he had hallucinations which he denied on other occasions or because Dr. Thurstone's Axis V GAF score for plaintiff differed from that of his treating psychiatrist a number of months earlier.  In addition, whether or not the examining physician who assessed plaintiff's physical condition may not have found any limitation that actually existed with regard to plaintiff's physical limitations, he is nevertheless a medical doctor

1   presumptively fully capable of recognizing the existence of a psychiatric condition.  Plaintiff's

2   treating psychiatrist determined that plaintiff suffered from Bipolar Disorder, NOS, and Attention

3   Deficit Hyperactivity Disorder, a condition or conditions that was not disputed by any other

4   physician in the record.  Plaintiff has evidently been on medication for these conditions,

5   including his anxiety and depression, and has been consistently seeing his psychiatrists but is

6   nevertheless still medically evaluated as having only a poor ability to follow work rules, relate to

7   co-workers, deal with the public, interact with supervisors, use judgment, deal with work stress,

8   function independently, maintain attention/concentration, understand, remember and carry out

9   detailed, complex or simple job instructions, or to behave in an emotionally stable manner, relate

10  predictably in social situations, or demonstrate reliability.  This comprehensively negative

11  summary of plaintiff's inability to function in a working environment is adequately supported by

12  the record.

13              Dr. Walter Yarbrough

14              With respect to his physical condition, plaintiff also contends that the ALJ did not

15  properly credit the treating opinion of Dr. Yarbrough with respect to plaintiff's right shoulder

16  impairment.  Following an M.R.I. of the shoulder, plaintiff was referred to an orthopedist, Dr.

17  Scott Bethune, who informed plaintiff in a letter dated October 12, 2007, that while plaintiff's

18  partial thickness rotator cuff tear was not a severe condition at that point it was likely to worsen

19  over time and offered the option of continuing pain management treatment involving therapy,

20  pills and injections, failing which surgical treatment would be necessary with a recovery time of

21  six months.  (Tr. at 159, 204).  Dr. Yarbrough found, on October 26, 2007, when plaintiff

22  presented with continuing right shoulder pain "and limited function" that plaintiff had failed to

23  follow-up with Dr. Bethune.  (Tr. at 204).  Plaintiff told Dr. Yarbrough that he misunderstood

24  and had been awaiting a call from Dr. Bethune, but Dr. Yarbrough made clear that plaintiff was

25  to contact Dr. Bethune.  (Id.)  Plaintiff indicated that he would probably proceed with surgery

26  because of his marked limitations.  (Id.)  Dr. Yarbrough noted plaintiff's "marked limited range

20

1   of motion."  (Id.)

2          Plaintiff contends that although the ALJ stated that he gave Dr. Yarbrough's

3   opinion "appropriate weight," this was undermined when he added that "claimant failed to

4   pursue either treatment option, indicating to me that his condition was not as severe as his

5   subjective report."  (Tr. at 25).  Plaintiff indicates that his having misunderstood how to proceed

6   explains the lack of follow-up; however, as defendant observes, in January 2008, Dr. Yarbrough

7   noted that plaintiff had not yet followed up with Dr. Bethune with regard to his shoulder

8   treatment; nor had either the clinical or surgery treatment option been implemented as of July

9   2008.  (Tr. 26, 30, 199, 201).  On July 16, 2008, the doctor noted that plaintiff wanted to stay

10  with Ibuprofen, of which he was to take at least two, three times daily.  (Tr. at 199).  If his

11  condition did not improve, Dr. Yarbrough noted that plaintiff "will either consider injection or

12  proceeding to surgery."  (Id.)  At the February, 2009 hearing, plaintiff testified he was taking no

13  medication for the shoulder.  (Tr. 27, 270).  Thus, the Commissioner contends that Dr.

14  Yarbrough's opinion that plaintiff had a marked limited range of motion was inconsistent with

15  his own treatment records, which show plaintiff did not pursue the treatment options for his

16  shoulder and for which only over-the-counter Ibuprofen was apparently prescribed.  (Tr. at 24-26,

17  28, 199, 201, 204).  Here again, however, it appears the ALJ was substituting his own opinion for

18  that of a treating physician.  In this case, the diagnosis was supported by an MRI interpreted both

19  by Dr. Yarbrough, a specialist in internal medicine, plaintiff's treating doctor, as well as an

20  orthopedic specialist, Dr. Bethune.

21  RFC

22          The only hypothetical posed to the vocational expert which took full account of

23  the evaluation of plaintiff's treating psychiatrists was posed by plaintiff's counsel:

24          Q.  "[If] we were to assume a person of claimant's age, education,
            past experience, and we're only going to consider mental
25          limitations here.  If such a person had a poor ability to follow work
            rules, relate to coworkers, deal with the public, use judgment,
26          interact with supervisors, deal with work stress, function

21

1   independently, maintain attention and concentration, understand,
    remember, and carry out simple job instructions, behave in an
2   emotionally stable manner, relate predictably in social situations,
    and demonstrate reliability, could such a person do claimant's past
3   work?
    A.  No, sir.
4   Q.  Any other work?
    A.  No, sir.
5

6   (Tr. at 279).

7   CONCLUSION

8           Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is

9   GRANTED IN PART, the Commissioner's Cross Motion for Summary Judgment is DENIED IN

10  PART, and this matter is remanded to the Commissioner for payment of SSI benefits, and

11  judgment with respect to payment of SSI benefits only is entered for the plaintiff pursuant to

12  sentence four of 42 U.S.C. § 405(g).

13  Dated:  September 23, 2011

14
                                        /s/ Gregory G. Hollows
15                                  UNITED STATES MAGISTRATE JUDGE

16  GGH:009
    garc0259.ss..wpd
17

18

19

20

21

22

23

24

25

26